SOUTH PORTO RICO SUGAR CO., Appellee, *v.* PUBLIC SERVICE COMMISSION, Appellant. JOSÉ RAMÓN QUIÑONES, Intervener and Appellant.

No. 10546. Argued May 5, 1952.—Decided July 10, 1952.

*Víctor Gutiérrez Franqui, Attorney General, A. Torres Braschi* and *Edgar S. Belaval, Assistant Attorneys General,* for appellant Public Service Commission. *Pablo Defendini* for intervener-appellant. *James R. Beverly, R. Castro Fernández,* and *Francisco Castro Amy,* for appellee.

Mr. Justice Marrero delivered the opinion of the Court.

This case originated in the Public Service Commission. José Ramón Quiñones in his own name and in representation and in behalf of other *colonos* of the Guánica Central filed there a complaint in which he alleged in substance that during the 1949 grinding season he was a *colono* of said cen-

tral which belonged to the respondent South Porto Rico Sugar Co.; that for that year the latter liquidated the sugar of its *colonos*, included in the marketable sugar quota fixed by the federal authorities, on the basis of the average price for said sugar during the liquidation period established by the Public Service Commission, less selling and marketing expenses, the respondent paying the corresponding amount in cash at the end of the liquidation period; but that the sugar which was not included in the aforesaid quota remained in respondent's possession as a deposit, without the latter acquiring any right thereto, either by law or by agreement or contract with its owners; and that when the 1949 grinding season was over, the federal authorities on three occasions increased the marketable sugar quota and the respondent, assuming to act as agent of its *colonos*, proceeded to sell the sugar on deposit as excess sugar of the original fixed quota, and without any agreement or contract, liquidated the sugar thus sold on the basis of the average price which, had said sugar been sold when produced, would have been obtained during the corresponding liquidation period, less selling and marketing expenses, in spite of the fact that the price obtained by the respondent was substantially higher.

The respondent answered denying the essential facts of the complaint and alleging that during the 1949 grinding season and pursuant to the determination of the U. S. Secretary of Agriculture (Production & Marketing Administration), it liquidated 81 per cent of the sugar corresponding to each *colono* at the monthly average price thereof delivered in New York, less selling and marketing expenses; that subsequently the Secretary readjusted the marketable sugar quotas and authorized the liquidation of 93.5401502 per cent of the sugar of the *colonos*, which respondent did, there remaining pending liquidation only the excess quota sugar, amounting to 6.4598498 per cent of the total production for

the said crop season, which it will be obliged to liquidate at the average New York price during the period between January 1 and February 15, 1950, less selling and marketing expenses.

The issue being thus joined, and after a hearing at which the parties offered oral and documentary evidence, the Public Service Commission entered a lengthy order directing the respondent South Porto Rico Sugar Co., to liquidate its *colonos'* sugar of the crop of said year, the sale of which, in excess of the original quota of 910,000 tons, was authorized by the Secretary of Agriculture of the United States, at the price or prices at which said sugar was sold by the respondent. The latter moved for a reconsideration which was denied. The South Porto Rico Sugar Co., then appealed to the former District Court of San Juan. After an extensive hearing the said court rendered judgment reversing and setting aside in its entirety the order appealed from and ordering the Commission to enter a new order dismissing the complaint. In the opinion delivered in support of its judgment, the said court made the following findings of fact:

"1. That for the 1949 grinding season the appellant South Porto Rico Sugar Co., the owner of the Guánica Central, purchased from all its *colonos* all the cane they produced.

"............

"8. That on April 16, 1949, the appellant certified to the U. S. Secretary of Agriculture the method it was going to follow for the liquidation of the cane of the *colonos* stating that it would liquidate monthly in cash, except for the unmarketable sugar which would be liquidated at the average price of raw sugar during the period from January 1, 1950 to February 15, 1950, as specified in the attached 'Notice.'

"9. That the 'Notice' attached to said certificate is dated March 1, 1949, was sent to all the *colonos* and states that 81 per cent of the sugar corresponding to the *colono* was to be liquidated at the average monthly price of sugar delivered in New York including cost, insurance and freight and that the liquidation of the remaining 19 per cent, estimated excess over

the production quota assigned to the island, would be retained until early in March 1950, to be liquidated at the average price corresponding to the period between January 1 and February 15, 1950 of the sugar delivered in New York including cost, insurance and freight. · The *colonos* were further notified in said NOTICE that should there be an increase in the marketable sugar quota during the current year, the appellant would liquidate it at the average monthly price of sugar delivered in New York including cost, insurance and freight.

"10. That the appellant liquidated both the original quota of 81 per·cent of the crop and the additional marketable sugar quotas, that is, from 81 per cent to 93.5401502 per cent of the crop, on the basis of the average New York market price during the period in which the canes were ground, that is, during the liquidation period fixed by the Commission, less selling and marketing expenses.

"11. That the appellant liquidated the remaining 6.4598498 per cent of the crop of its *colonos*, that is, the excess sugar quota, at the average New York market price during the period between January 1 and February 15, 1950, less selling and marketing expenses.

"            .        .        .        .        .        .        .

"14. That the appellant sold the marketable sugar of the additional quota at a price higher than the price at which it liquidated the sugar of its *colonos*, having made its last sale pursuant to a contract of November 10, 1949.

"15. That on December 19, 1949 the *colonos* for the first time questioned the appellant as to the method of liquidating the marketable sugar of the additional quota, claiming then and for the first time that the appellant should have liquidated their sugar at the price at which the appellant sold said sugar and not at the average New York market price during the period in which they delivered the cane which was the price at which their sugar was liquidated.

"16. That at the beginning of the 1949 season the appellant had filed in the Public Service Commission two types of contract with its *colonos;* one, a notarial deed and the other, a letter-contract, which contained its grinding conditions.

"            .        .        .        .        .        .        .

"18. That prior to the aforesaid grinding season the Public Service Commission had approved the General Regulations for Sugar Companies and § § 7, 11, 12, and 19 of said Regulations were declared null and void by the Supreme Court of Puerto Rico in *Godreau & Co.* v. *Public Service Comm'n*, 71 P.R.R. 608, decided June 23, 1950."

Its opinion also contains the following conclusions of law:

"1. That the contracts executed by the appellant and its *colonos* for the purchase of cane produced by the latter during the 1949 grinding season are valid.

"     .     .     .     .     .     .     .     .

"2. That the appellant was the sole owner of all the sugar produced during the 1949 grinding season by cane grown by its *colonos*.

". . . the evidence presented before the Commission clearly shows that the appellant did not limit itself to the purchase from its *colonos* of the marketable sugar of the original quota. . . .

"3. That the appellant did not lose its title of absolute owner of the sugar produced by the canes grown by the *colonos*, because it failed to pay the amount of the liquidations of the additional sugar quota on time.

"It is true that pursuant to the grinding conditions of the appellant (exhibit 5, clause I) the latter was obliged to pay to its *colonos* the liquidations of their canes within the first 10 days of each month subsequent to the delivery of the canes, but the noncompliance with said condition does not carry with it the loss of the title to the canes purchased and much less did it make the appellant a sales agent of the *colonos*."

From this judgment rendered by the lower court both the intervener José Ramón Quiñones and the Public Service Commission appealed. On appeal they filed a joint brief and therein aver that said court erred in holding: (1) that the South Porto Rico Sugar Co., purchased from all its *colonos* all the canes they produced; (2) that said company was the sole owner of all the sugar produced by the canes of its *colonos* during the 1949 grinding season; (3) that it could

validly purchase the canes produced by its *colonos* by means of contracts to that effect; (4) that the notice of March 1, 1949 (exhibit 12) entitled the South Porto Rico Sugar Co., to liquidate the sales of sugar in excess of the basic quota at the same price at which the sugar of said quota was sold; (5) that it was entitled to liquidate the sugar produced by the canes of its *colonos*, corresponding to their share by its own determination; and (6) in rendering judgment setting aside the order of the Commission and directing the latter to enter another dismissing the complaint.

As noted, the federal authorities fixed for the Island of Puerto Rico for the 1949 grinding season a quota of 910,000 tons of sugar. That tonnage represented 81 per cent of the total amount of sugar produced here. In letters addressed to the South Porto Rico Sugar Co., on August 26 and 31 and September 30, 1949, the U. S. Department of Agriculture informed the former that it had granted additional quotas amounting to a total of 12.55 per cent.[1] Consequently, of the total amount of sugar manufactured during the season in question there remained only an excess of 6.45 per cent. There is no controversy whatsoever regarding the 81 per cent of the original quota authorized and the 6.45 per cent corresponding to the sugar produced in excess of the quota. The problem involved here centers entirely on the price to be paid for the 12.55 per cent of the sugar sold as additional quota. The contention of the original petitioner (intervener-appellant here) was and is that said sugar of additional quota must be liquidated at the actual price at which it was sold. South Porto Rico Sugar Co.'s contention, on the contrary, has always been that said sugar must

---

[1] The original quota was, as already stated, of 81 per cent of the sugar produced. In a letter addressed by the U. S. Department of Agriculture to the South Porto Rico Sugar Co., on August 26, 1949 the latter was informed that the quota was increased to .840585617; in another of the 31st of the same month to .878815517 and in a third letter dated September 30 to .935401502.

be liquidated, as it did, at the monthly average New York market price during the period in which the canes were delivered.[2]

We shall now discuss the errors assigned: The first finding of fact which appears in the opinion of the lower court, copied above, to the effect "that for the 1949 grinding season the appellant South Porto Rico Sugar Co., the owner of the Guánica Central, purchased from all its *colonos* all the cane they produced," is wholly unsupported by the evidence before the said court. What said evidence proved was that 81 per cent of the sugar produced by the canes delivered by the *colonos*, corresponding to the quota originally authorized by the U. S. Secretary of Agriculture, was liquidated by the South Porto Rico Sugar Co., at the average price prevailing in the New York market, within the 14 days following the month in which the canes were delivered by the *colonos* and ground by the central. However, we repeat, there is no controversy as to the 81 per cent. Therefore, we need not determine in regard thereto whether the respondent purchased the canes or the sugar of the *colonos*, or whether, on the contrary, it merely acted as a representative of the *colonos* in selling the sugar to third parties. Said evidence also showed that the remaining 19 per cent of the sugar produced, *in the absence of the three authorizations of federal authorities to which we have referred,* would have been liqui-

---

[2] The average price for the sugar corresponding to 81 per cent of the original quota fluctuated between $5.628 and $5.86 cwt. Said sugar was liquidated within the 14 days following the liquidation period in which the canes were delivered, that is, from January to June 1949.

The sugar corresponding to the 6.45 per cent of excess quota was liquidated at the average price prevailing between January 1 and February 15, 1950, that is, $5.719. The *colonos* received the payments for those liquidations in February 1950.

The sugar corresponding to the 12.55 per cent, the total amount of the three additional quotas, was liquidated at the price which prevailed in each liquidation period in which the canes were ground, from January 1 to June 30, 1949. It was sold at a price which fluctuated between $5.85 and $6.03 cwt. and was paid on liquidation to the *colonos* between August 13 and the middle of October 1949.

dated by the South Porto Rico Sugar Co., at the average New York price of raw sugar during the period between January 1, 1950 and February 15 of that same year, less selling and marketing expenses. There is not the slightest doubt as to this. Since of that 19 per cent there remained only a balance of 6.45 per cent, said excess sugar was liquidated in accordance with the foregoing. As to said 6.45 per cent we likewise need not decide whether the respondent purchased the canes or the sugar of the *colonos*. Such determination is required only in connection with the 12.55 per cent corresponding to the total amount of the three additional quotas.

The notice [3] of the South Porto Rico Sugar Co., admitted in evidence as Exhibit 12 in no way constitutes a contract between it and the *colonos*, inasmuch as it does not show that the *colonos* accepted the conditions stipulated therein, nor that there was, hence, any agreement between the former

---

[3] The notice copied verbatim reads as follows:

"SOUTH PORTO RICO SUGAR COMPANY OF PUERTO RICO
Ensenada, Puerto Rico
March 1, 1949

NOTICE

"Pursuant to § 3(c) of the Determination of the Secretary of Agriculture of the United States of America, in connection with the Fair and Reasonable Prices for the 1948–49 crop of Puerto Rico, we intend now to liquidate the 81 per cent of the sugar corresponding to the *colono*, at the average monthly price of sugar delivered in New York, including cost, insurance and freight.

"The liquidation of the remaining 19 per cent, estimated excess of the production quota assigned to the Island, will be retained until the beginning of March 1950, to be liquidated at the average price corresponding to the price of January 1 to February 15, 1950 of the sugar delivered in New York including cost, insurance and freight.

"However, should there be any increase in the marketable sugar quota during the current year, due to deficiencies in other producing areas, we shall liquidate a part of the proportional excess at the monthly average price of the sugar delivered in New York, including cost, insurance and freight.

Very truly yours,
(Signed) G. MICHEL,
Superintendent of *Colonos*."

and the latter regarding said conditions. Said notice merely shows respondent's purpose or intention to liquidate the 81 per cent of the sugar corresponding to the *colono* at the monthly price of the product delivered in New York, including cost, insurance and freight; and to retain the remaining 19 per cent until the beginning of March 1950, for liquidation at the average price corresponding to the period between January 1 and February 15, 1950, of the sugar delivered in New York. Nevertheless, inasmuch as the notice states further that "should there be any increase in the marketable sugar quota during the current year, due to deficiencies in other producing areas, we shall liquidate a part of the proportional excess *at the average monthly price of the sugar delivered in New York,* including cost, insurance and freight," we must determine the scope of those words insofar as they might shed some light on the question before us.

■ We do not construe the last paragraph of the notice —nor the notice as a whole—as a purchase by South Porto Rico Sugar Co., from its *colonos* of the sugar corresponding to the additional quotas. Nor as a purchase of the canes which produced said sugar. We construe it in the sense that the remaining 19 per cent, which we might label as sugar in excess of the basic quota, would be liquidated at the average price prevailing during the period between January 1 and February 15, 1950, for sugar delivered in New York including the aforesaid expenses; and in the sense that in the event of an increase in the original quota the sugar corresponding to such increase would be liquidated at the price or prices prevailing in the New York market on the date of its sale. The notice says, as we have seen, "we shall liquidate a part of the proportional excess at the average monthly price of the sugar delivered in New York." In the absence of specific words to that effect, the phrase "average price . . . delivered in New York" does not mean the price of the sugar delivered in New York a number of months

previously, nor a number of months after having been sold. Logic indicates that those words must mean the average price at which the sugar of the additional quotas were sold, delivered in New York.

The very actions of the respondent reinforce our view. If it intended to purchase the canes of the *colonos* in cash, why did it not pay therefor when the canes were delivered to it? In default of cash payment, why did it not credit in its books in favor of the *colonos* the value of said canes? Why, upon selling the sugar of the additional quotas so many months after the cane had been delivered to it, did it not pay interest on the value thereof, from the date on which it received them until the sugar was liquidated? All these considerations ratify our belief that South Porto Rico Sugar Co., did not purchase the canes and that it always intended to liquidate the sugar of additional quotas at the price prevailing at the time of the sales thereof.

On the other hand, the documents offered in evidence by the South Porto Rico Sugar Co., in connection with contracts which it executed with Alberto Márquez and Ernesto Quiñones Sambolín, regardless of the language used in said contracts or of their interpretation in the sense that it purchased from the latter all the canes produced by their farms, do not mean that before the Commission there were contracts of an identical nature between it and the complainants. On the contrary, the evidence tended to show a different situation.

In view of the foregoing considerations we reach the conclusion that the South Porto Rico Sugar Co., did not acquire by purchase from the *colonos* the sugar corresponding to the 12.55 per cent of the three additional quotas, nor the canes from which said sugar was manufactured; that said South Porto Rico Sugar Co., merely acted in connection with the aforesaid sugar as a sales agent of the *colonos;* and that,

therefore, it should have liquidated said sugar of the *colonos* at the prices at which it sold said sugar, less selling and marketing expenses.[4]

The judgment appealed from will be reversed and another entered ordering the South Porto Rico Sugar Co., to liquidate the *colonos'* sugar of the additional quotas in the manner indicated above.

---

[4] In *Pérez* v. *Claudio*, 48 P.R.R. 559, this Court held that a contract entered into between Claudio and South Porto Rico Sugar Co., entitled "Private Contract of Purchase and Sale of Cane" was "one for advances and grinding of cane rather than one of purchase and sale." The contract construed in that case is quite similar to the situation involved herein.